# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

ERICA D. KITTLES,

    Plaintiff,

    v.

HEALTHCARE STAFFING, INC.,
VANESSA SHEARER, BONITA MIKEL,
and CINDY ACKERMAN,

    Defendants.

CV 213-138

## ORDER

Plaintiff Erica Kittles, a black woman employed by Defendant Healthcare Staffing, Inc., complained to her superiors when Anthony Barnett, a black employee the staffing agency had placed at a nursing facility, was terminated from that placement. Plaintiff was fired a short time later. In this action, Plaintiff brings claims for discriminatory termination and retaliation under Title VII and § 1981 against Defendants Healthcare Staffing and its employees, Bonita Mikel and Cindy Ackerman. She also brings a § 1985(3) claim against Defendant Vanessa Shearer, Human Resources Coordinator at the nursing facility that fired Barnett, along with Defendants Healthcare Services, Mikel, and Ackerman. Finally, Plaintiff brings a state

AO 72A
(Rev. 8/82)

law claim for intentional infliction of emotional distress, and a claim for attorney's fees. Defendant Shearer has filed a motion for summary judgment (Dkt. no. 29), as have Defendants Healthcare Staffing, Mikel, and Ackerman (Dkt. no. 31).[1]

## FACTUAL BACKGROUND

Plaintiff Erica D. Kittles was employed as a staffing coordinator by Defendant Healthcare Staffing ("HCS"). Dkt. no 29-3 ("Kittles Dep."), 39:1-4. HCS is a Georgia for-profit corporation, and Plaintiff worked in its Brunswick office. Dkt. no. 1, ¶ 18. As a staffing coordinator, Plaintiff was responsible for attracting potential employees. When potential employees applied for work through the agency, Plaintiff would administer various tests to the employees to measure their aptitude in different nursing-related skills. Kittles Dep. 39:5-25. In addition to the knowledge-based nursing skills tests, Plaintiff would administer the "First Advantage" test, which was designed to test an applicant's personality and integrity. Id. at 39:12-41:6.

All applicants for healthcare-related positions were required to take the First Advantage Test and receive a passing score before they could be considered for employment. Id. at 69:16-20; Dkt. no. 31-1 ("Mikel Decl."), ¶ 9. While the

---

[1] Because Defendants Healthcare Staffing, Mikel, and Ackerman jointly filed their motion for summary judgment, the Court occasionally refers to these Defendants together as the "HCS Defendants."

knowledge-based tests could be taken more than once by an applicant, the First Advantage Test was designed to only be taken once. Kittles Dep. 112:8-12. If an applicant were to take the test multiple times, he could manipulate the test. Mikel Decl. ¶ 11. For this reason, the training manual for the First Advantage Test states "under no circumstances will an applicant be allowed to retake the test once it is completed." Id.

Plaintiff admits that she was regularly reminded that the First Advantage Test could not be given to an applicant more than one time, and that she was forwarded an email on February 9, 2012, that made this point. See Dkt. no. 31-2 (HCS Defendants' Statement of Undisputed Facts, or "HCS SUF"), ¶ 15; Dkt. no 42-2 (Pl.'s Resp. to HCS SUF), ¶ 15. She also admits that Hayley Barr, who also worked at HCS's Brunswick office, emailed Plaintiff on her work email account on March 8, 2012, stating:

> Just an FYI in case we haven't discussed this, when applicant takes the First Advantage Test we are not allowed to discuss their scores with them and they are not allowed to retake it should they score poorly on it. If they do not score well enough to be considered then we just have to send them a NO HIRE letter.

HCS SUF ¶ 16; Pl.'s Resp. to HCS SUF ¶ 16. However, Plaintiff claims that despite these reminders to only give the First Advantage Test once per applicant, she was frequently instructed by her supervisors to allow some applicants to take the test

multiple times. Plaintiff testified, "[w]e were told they could take it once. But if it was somebody that we thought would be a good candidate, we had to get permission from the supervisor [to allow them to retake the test], and that's what I always did." Kittles Dep. 68:23-69:3. Plaintiff says she does not have any written documentation of her asking a supervisor to allow an applicant to retake the First Advantage Test. Id. at 69:11-15.

On July 17, 2012, Plaintiff was given a written warning for poor job performance. Pl's Resp. to HCS SUF ¶¶ 20-22. The warning did not mention anything about allowing applicants to retake the First Advantage Test. Instead, it admonished Plaintiff for excessive absences and substandard job performance, and attributed the poor performance issues to Plaintiff allowing personal matters to interfere with her job duties. HCS SUF ¶ 21. The written warning further stated, in all capital letters:

> YOU ARE FORMALLY BEING WARNED TO BRING TO YOUR
> ATTENTION THE SEVERITY OF THIS SITUATION, FAILURE TO
> CORRECT THIS BEHAVIOR AND/OR VIOLATION OF COMPANY
> POLICY WILL RESULT IN ADDITIONAL DISCIPLINARY ACTION
> UP TO AND INCLUDING DISCHARGE.

Id. ¶ 22.

Around the time Plaintiff received this warning, a nurse whom HCS had placed at a nursing facility named Gateway was terminated from his position. Gateway is a public, non-profit, community-based organization created under Georgia law to

provide disability services to people with developmental disabilities, mental illness, and addictive diseases. <u>See</u> Dkt. no. 29-1, p. 1; Ga. Code Ann. §§ 37-2-6, 37-2-6.1. Defendant Vanessa Shearer is the Human Resources Director at Gateway. Dkt. no. 29-2, ¶ 4.

Anthony Barnett, the nurse who was terminated from Gateway, is a black male. Because HCS had placed him at Gateway, many of his employment records were kept at HCS. His direct supervisor at Gateway, though, was a woman named Cathy Thompson. Plaintiff had heard from others that Thompson wanted Barnett removed from his position because he was not performing his job correctly. Kittles Dep. 127:5-17. Plaintiff agrees that there is no dispute that "Cathy Thompson was unhappy with [Barnett's] work performance." Kittles Dep. 131:24-135:3. However, Plaintiff believed that there had never been any written complaints or write-ups against Barnett and that no such documents existed in his file. <u>See</u> Kittles Dep. 192:1-193:7. Aside from a conversation she had directly with Barnett after he was terminated, Plaintiff never spoke with anyone at Gateway about how well employees, including Barnett, were performing. Kittles Dep. 118:6-9. Furthermore, she admits that any information she has on whether or not Barnett was performing his job well would be hearsay, and not based on firsthand knowledge. <u>Id.</u> at 125:15-25.

AO 72A
(Rev. 8/82)

After Barnett was fired, he filed an EEOC claim against HCS alleging discrimination on July 20, 2012. Ackerman Decl. ¶ 15. Soon after HCS received the EEOC claim, Plaintiff says that Defendant Shearer called HCS and asked Plaintiff to look in Barnett's file to see what kind of records were kept in relation to his job performance. Kittles Dep. 116:23-117:9. Plaintiff refused to pull the file, and another employee had to do so. Id. at 126:5-127:4. While another employee was getting the file, Defendant Shearer was placed on speakerphone, and Plaintiff says she could hear the conversation between Shearer and the other employee. Id. Plaintiff says "they were trying to find something in his chart, and nobody could find anything. And at that time I felt the tension going. I stayed out of it, and I just didn't want any part of it because I felt like eventually it would come to this right here," referring to her current deposition in her own wrongful termination lawsuit. Id.

A few weeks later, Defendant Cindy Ackerman, who is HCS's Corporate Director of Human Resources and works at the HCS corporate office in College Park, Georgia, went to the HCS Brunswick office to interview witnesses concerning Barnett's EEOC claim. Id. at ¶¶ 2-3, 16. In Brunswick, Defendant Ackerman met with Defendant Bonita Mikel, Director of the HCS Brunswick office, to conduct the interviews. Mikel Decl. ¶ 23. The two Defendants spoke with Plaintiff about Barnett's termination, and

Plaintiff told them that she disapproved of Barnett's termination. Kittles Dep. 212:8-23.

Defendant Ackerman says that it is her practice, when traveling to a satellite office, to do a general audit of the office's hiring practices. Ackerman Decl. ¶¶ 17-18. When she visited the Brunswick office, she audited some applicant files to ensure that they were complete and that proper procedures were being followed. Id. ¶ 19. Defendant Ackerman discovered that many applicants had been given the opportunity to take the First Advantage Test, which is designed to only be taken once, several times, some as many as ten times. Id. ¶¶ 20-22. When Defendants Ackerman and Mikel confronted Plaintiff about this practice, she admitted to allowing applicants to take the First Advantage Test more than once. Dkt. no. 45-1 ("Ackerman Second Decl."), ¶ 4. Defendant Ackerman says she did not find any evidence that anyone except Plaintiff had been improperly allowing applicants to take the First Advantage Test multiple times. Id. ¶ 5. The HCS Defendants then terminated Plaintiff, the stated reason being that she had recently been reprimanded and warned that any violation of company policy could result in her termination, and her offering the First Advantage Test multiple times constituted such a violation.

AO 72A
(Rev. 8/82)

Plaintiff maintains that she was terminated because she complained to her supervisors about what she perceived to be Barnett's discriminatory termination.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the

burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of is conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).

## DISCUSSION

### I.   Title VII and 42 U.S.C. § 1981 Discrimination Claims

Counts I and III of Plaintiff's Complaint allege Title VII claims for disparate treatment, based on Plaintiff's race,

against Defendant HCS, along with a § 1981 claim against HCS and possibly HCS employees Mikel and Ackerman.[2]

Title VII prohibits employers from discriminating against a person based on race. 42 U.S.C. § 2000e-2(a)(1). Additionally, 42 U.S.C. § 1981 provides that all persons in the United States "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," and this provision has been interpreted to prohibit employment discrimination. Addison v. Ingles Mkts., Inc., 515 F. App'x 840, 841-42 (11th Cir. 2013). The Court will address Plaintiff's Title VII and § 1981 discrimination claims together as both claims "have the same requirements of proof and the same analytical framework." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

"A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or statistical proof." Alvarez v. Royal Atl. Developers, Inc.,

___

[2] It is unclear from Plaintiff's complaint if she targets any of the individual Defendants (Shearer, Mikel, and Ackerman) under her § 1981 claim. Plaintiff's Response to Shearer's Motion for Summary Judgment (Dkt. no. 43-1) appears to concede that the only claim brought against Shearer is the Count IV, § 1985(3) conspiracy claim. Defendants HCS, Mikel, and Ackerman's Motion for Summary Judgment (Dkt. no. 31-1) addresses the § 1981 claim along with the Title VII claims, but does not argue that Defendants Mikel and Ackerman are not named under the § 1981 claim. Plaintiff's response (Dkt. no. 42-1) does not clarify this point, either. In any event, the Court will not fret over whether Mikel and Ackerman are named as Defendants for the § 1981 claim because, to the extent that they are, the § 1981 claim would fail as to them for the same reasons it fails as to HCS. Finally, even though Plaintiff named all of the individual Defendants in her Title VII claims, see Dkt. no. 1, p. 45 (Relief Requested, (b)), she concedes in her reply briefs that none of the individual Defendants can be liable for her Title VII claims. Dkt. no. 42-1, p. 10; Dkt. no. 43-1, p. 8.

AO 72A
(Rev. 8/82)

610 F.3d 1253, 1264 (11th Cir. 2010) (quoting Rioux v. City of Atlanta, 520 F.3d 1269, 1274 (11th Cir. 2008)). The parties do not discuss the nature of Plaintiff's evidence of discrimination. Plaintiff's allegations, though, plainly come from inferences she has made about her termination based on the circumstances. Likewise, she has not proffered any direct or statistical evidence that her termination was discriminatory. Thus, this Court will proceed under the two available "circumstantial evidence" analyses.

The more common analysis enumerated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), applies when the plaintiff is relying on comparators as evidence of differential treatment. Wilson, 376 F.3d at 1087. "Under this framework, the plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally." Id. A plaintiff may establish his *prima facie* case by showing

> (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job.

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). The similarly situated employee, known as a "comparator," must be similarly situated "in all relevant respects," and must be

"nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1074, 1091 (11th Cir. 2004).

If the plaintiff meets her burden of establishing her *prima facie* case, then there is a presumption that the employer acted illegally, which the employer may rebut by articulating a legitimate, nondiscriminatory reason for its actions. <u>Id.</u> at 1087. If the employer satisfies this burden of production, then the burden shifts back to the plaintiff, who must show that the defendant's proffered reasons for its actions are simply a pretext for discrimination. <u>Id.</u> While the burden of production may shift back and forth between the plaintiff and defendant, it is the plaintiff who ultimately bears the burden of showing that the defendant intentionally discriminated against her. <u>Id.</u> (quoting <u>Burdine</u>, 450 U.S. at 256).

Where the <u>McDonnell Douglas</u> framework is not useful for lack of comparators, courts rely on a more straightforward circumstantial evidence analysis—albeit one that requires more piercing evidence of discrimination. The Eleventh Circuit has held that the <u>McDonnell Douglas</u> framework is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case. <u>Sims v. MVM, Inc.</u>, 704 F.3d 1327, 1333 (11th Cir. 2013).

AO 72A
(Rev. 8/82)

> Instead, the plaintiff will always survive summary
> judgment if [she] presents circumstantial evidence
> that creates a triable issue concerning the employer's
> discriminatory intent. A triable issue exists if the
> record, viewed in a light most favorable to the
> plaintiff, presents a convincing mosaic of
> circumstantial evidence that would allow a jury to
> infer intentional discrimination by the decisionmaker.

Id. (citations and quotations omitted).

Here, Defendants concede that Plaintiff belongs to a racial minority and was subjected to an adverse employment action. However, they argue that Plaintiff has failed to show she was treated differently than similarly situated employees outside of her protected class.[3]

In her Response brief, Plaintiff attempts to establish a comparator by naming "Ms. Gardner, a white female staffing coordinator, just like Ms. Kittles . . ." Dkt. no 42-1, p. 9. According to Plaintiff, Ms. Gardner was also told to retest HCS applicants in direct contradiction to HCS's stated policies, but HCS did not fire Ms. Gardner for doing the retests as it did with Ms. Kittles. Id. However, Plaintiff's attempt to establish Gardner as a comparator fails because she does not establish

---

[3] The HCS Defendants also argue that, because Plaintiff had been recently issued a warning and then was found to have been administering the First Advantage Test multiple times, that she was "unqualified" to perform her job at the time of her termination. The parties never discuss whether this fault of Plaintiff's would more appropriately be considered as a "legitimate, nondiscriminatory reason" for Plaintiff's termination assuming she had established her *prima facie* case. Because it makes no difference to the outcome, the Court will address the HCS Defendants' stated reason for terminating plaintiff as a "legitimate, nondiscriminatory reason" (to be considered after Plaintiff establishes her *prima facie* case) rather than a lack of qualification (which is considered as part of Plaintiff's *prima facie* case).

that Gardner was "similarly situated" in all relevant respects to Plaintiff. The relevant circumstances to Plaintiff's termination are that she had recently been given a written warning for substandard job performance and she was later found to have violated company policy by allowing applicants to take the First Advantage Test multiple times. In her response brief, the only evidence Plaintiff offers as to how similarly situated she is to Gardner is that both of them were told to allow some "retests" in certain circumstances. See Dkt. no. 42-3 ("Kittles Aff."), ¶¶ 6-8. However, Plaintiff does not state in her affidavit that Gardner was specifically retesting applicants with the First Advantage Test (as opposed to any of the several other tests HCS uses in evaluating applicants), nor does she state that Gardner was, like Plaintiff, on a probationary period of sorts for absenteeism and poor job performance. In fact, Defendants produced evidence from the record that Gardner was not similarly situated to Plaintiff. In her audit of HCS's hiring practices, Defendant Ackerman says she found no evidence of any employee except Plaintiff allowing applicants to take the First Advantage Test multiple times. Ackerman Second Decl. ¶ 5. This evidence stands uncontroverted. Thus, because the evidence in no way shows that Gardner was also administering the First Advantage Test more than once per applicant, and, as far as the Court has been apprised, had not been recently admonished for

poor job performance, Plaintiff has failed to create a material issue of fact as to whether Gardner was similarly situated to Plaintiff "in all relevant respects." See Wilson, 376 F.3d at 1087.

Additionally, even if Plaintiff had adequately established her *prima facie* case, she has still failed to rebut the HCS Defendants' proffered "legitimate, nondiscriminatory" reason for her termination. Just a few weeks before her termination, Plaintiff received a written warning for her frequent absences from work and failure to follow the proper protocols for asking off of work. The warning also reprimanded her for substandard job performance. At the bottom of the reprimand, in all capital letters, a warning read, in part, ". . . VIOLATION OF COMPANY POLICY WILL RESULT IN ADDITIONAL DISCIPLINARY ACTION UP TO AND INCLUDING DISCHARGE." After Defendant Ackerman came to the HCS office to investigate Barnett's termination, she discovered in an audit that Plaintiff was still administering the First Advantage Test multiple times for certain applicants. This conduct was a violation of HCS policy, and Plaintiff had been placed on notice that such conduct would result in her termination. Thus, Plaintiff's failure to adhere to HCS's policies was a legitimate, nondiscriminatory reason for HCS to terminate her from her position as staffing coordinator.

AO 72A
(Rev. 8/82)

Plaintiff has not argued that this proffered reason was pretextual.

Thus, Plaintiff has failed to produce evidence from the record supporting her *prima facie* case. Summary judgment is appropriate, then, on Counts I and III for discriminatory termination under Title VII and § 1981.

## II. Title VII Claim For Retaliation

Count II of Plaintiff's complaint brings a claim for retaliation under Title VII against HCS.[4] Plaintiff's singular theory of retaliation is that HCS terminated her because she "did not play the game to impugn Mr. Barnett." Dkt. no. 42-1, p. 10. See also Pl.'s Resp. to HCS SUF ¶ 42 (". . . Defendants fired Ms. Kittles for not supporting Defendants' racial and sexual discrimination of Mr. Barnett.").

To establish a retaliation claim under Title VII, Plaintiff must prove that she: (1) engaged in statutorily protected activity; (2) suffered a materially adverse action; and (3) there was a causal relation between the protected activity and the adverse action. See Butler v. Alabama Dept. of Transp., 536 F.3d 1209, 1212-13 (11th Cir. 2008) (quoting Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008)).

---

[4] As noted above, the Complaint specifically named the individual Defendants under Count II as well, but Plaintiff later conceded that they were not appropriate Title VII Defendants.

AO 72A
(Rev. 8/82)

A plaintiff engages in a "statutorily protected activity" when she protests an employer's conduct—even if that conduct is actually lawful—so long as she demonstrates that she had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." <u>Little v. United Techs., Carrier Transicold Div.</u>, 103 F.3d 956, 960 (11th Cir. 1997). While the "good faith belief" standard is subjective, this belief must be "*objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." <u>Id.</u> (emphasis in original).

An action is "materially adverse" if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Chapter 7 Trustee v. Gate Gourmet, Inc.</u>, 683 F.3d 1249, 1259 (11th Cir. 2012) (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)).

Finally, the "causal relation" prong of the plaintiff's *prima facie* case requires the plaintiff to show that the statutorily protected activity was the "but-for" cause of the adverse employment action. <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2533 (2013). "This requires proof that

AO 72A
(Rev. 8/82)

the unlawful retaliation would not have occurred in the absence
of the alleged wrongful action or actions of the employer." Id.

"After the plaintiff has established the elements of a
claim, the employer has an opportunity to articulate a
legitimate, nonretaliatory reason for the challenged employment
action as an affirmative defense to liability." Goldsmith, 513
F.3d at 1277. If the defendant meets this burden of production,
the burden shifts back to the plaintiff to satisfy her "ultimate
burden of proving retaliation by a preponderance of the evidence
and that the reason provided by the employer is a pretext for
prohibited retaliatory conduct." Id.

Here, it is uncontested that Plaintiff's termination
amounts to a "materially adverse" action. However, Plaintiff
fails to satisfy the first and third prongs of her *prima facie*
retaliation case. First, Plaintiff has not produced any evidence
that her belief that Barnett was discriminated against was
objectively reasonable, and there is substantial evidence in the
record suggesting that her conclusion that his termination was
racially motivated was objectively unreasonable. For instance,
Plaintiff and Barnett worked for separate organizations and at
separate locations. Kittles Dep. 118:12-20. She only went to the
Gateway office, where Barnett worked, for her initial
orientation and for occasional deliveries. Id. 118:21-119:13.
Plaintiff did not communicate with Gateway regarding how

employees were performing their jobs. Id. 118:6-9. However, she had heard that Cathy Thompson, Barnett's supervisor at Gateway, wanted him removed because he was not performing his job sufficiently. Id. 127:5-17. Based on Plaintiff's own deposition and the other evidence before the Court, it is undisputed that Plaintiff simply concluded that Barnett was discriminated against because he was fired and because he was black—even when she had heard that the actual reason he was fired was his poor job performance. Defendants have shown an absence in the record of any evidence that would support a finding that Plaintiff's subjective belief of Barnett's discriminatory termination was objectively reasonable. Plaintiff does not, in her responses to Defendants' motions for summary judgment and Defendants' statements of undisputed facts, identify evidence in the record that would support such a finding. All Plaintiff offers in response to Defendants' challenge on this point are conclusory allegations that "the only one reasonable conclusion" for why Barnett lost his job was because of his race and sex. Dkt. no. 42-1, p. 10. Such conclusory allegations by a nonmovant are insufficient to overcome a motion for summary judgment.

Additionally, even if Plaintiff had provided evidence that she reasonably believed Barnett's termination was discriminatory, she has failed to show that her objection to that termination was the "but-for" cause of her own termination.

19

The record plainly shows that HCS fired Plaintiff because she continued to give HCS applicants multiple opportunities to take the First Advantage Test, in violation of company policy, even when she had been warned before not to do so. Plaintiff's conduct alone would have resulted in her own termination regardless of Defendants' alleged discriminatory termination of Barnett. Plaintiff has failed to show that her objection to Defendants' allegedly unlawful conduct was the but-for cause of her termination, and thus has failed to establish her *prima facie* retaliation claim. The Court grants Defendants' motion for summary judgment as to Count II.

### III. 42 U.S.C. § 1985(3) Claims

Count IV of Plaintiff's Complaint alleges that Defendants HCS, Mikel, Ackerman, and Shearer all conspired to deprive Plaintiff of her "right to equal protection of the laws, or of equal privileges and immunities under the laws, and [the] right to exercise her rights or privileges of a citizen of the United States," in violation of § 1985(3), by conspiring to fire her because she is black and because she refused to participate in the discriminatory investigation and termination of Mr. Barnett. Dkt. no. 1, ¶ 183.

To state a claim under § 1985(3), a plaintiff must allege:

> (1) defendants engaged in a conspiracy; (2) the conspiracy's purpose was to directly or indirectly deprive a protected person or class the equal

protection of the laws, or equal privileges and
immunities under the laws; (3) a conspirator committed
an act to further the conspiracy; and (4) as a result,
the plaintiff suffered injury to either his person or
his property, or was deprived of a right or privilege
of a citizen of the United States.

Jimenez v. Wellstar Health Sys., 596 F.3d 1304, 1312 (11th Cir.

2010) (citing Johnson v. City of Fort Lauderdale, 126 F.3d 1372,

1379 (11th Cir. 1997)). "When the alleged § 1985(3) conspirators

are private actors, the plaintiff must demonstrate that the

conspiracy was aimed at rights constitutionally protected

against private impairment." Id. (citing Bray v. Alexandria

Women's Health Clinic, 506 U.S. 263, 274 (1993); Park v. City of

Atlanta, 120 F.3d 1157, 1162 (11th Cir. 1997)). "These rights

include only select 'serious constitutional right[s].'" Id.

(citing Cook v. Randolph County, 573 F.3d 1143, 1157 (11th Cir.

2009)).

"The only rights the Supreme Court has expressly declared

enforceable against private conspirators under § 1985(3) are the

right to interstate travel and the right against involuntary

servitude." Id. (citing Bray, 506 U.S. at 278). The Supreme

Court has declared that the freedom of speech and the rights

protected under Title VII are insufficient to form the basis of

§ 1985(3) actions against private actors. Id. (citing Bray, 506

U.S. at 278; Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442

U.S. 366, 378 (1979)). Additionally, the Eleventh Circuit has

AO 72A
(Rev. 8/82)

held that private conspiracies to violate rights protected under § 1981 are likewise insufficient to form the basis of a § 1985(3) claim. Id.

Defendant Shearer, who is the Human Resources Director at Gateway, a public organization created and existing under the laws of Georgia, is the only defendant who is a public employee. The parties do not address whether her role at Gateway makes her a public actor for purposes of § 1985(3), but because this claim ultimately fails, the court will assume, for purposes of this Order, that she is. Thus, Defendant Shearer's presence in the alleged conspiracy is necessary for Plaintiff to bring a § 1985(3) claim for unlawful termination and retaliation (assuming that mixed public/private conspiracies are actionable as public conspiracies under § 1985(3), another point neither party addresses). Otherwise, the only parties to the conspiracy would be HCS, a private corporation, and its employees. A purely private § 1985(3) conspiracy cannot be based on constitutional rights other than the right to be free from involuntary servitude or her right to interstate travel.[5] Because these rights are not the basis of Plaintiff's § 1985(3) claim, she

---

[5] Whether HCS and its own employees could engage in a conspiracy is questionable, given the Eleventh Circuit's adoption of the intracorporate conspiracy doctrine. See McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) (explaining that the doctrine of intracorporate conspiracy bars claims arising under § 1985(3) because "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself.").

AO 72A
(Rev. 8/82)

must show that Defendant Shearer participated in the conspiracy to survive summary judgment.

Plaintiff has not proffered any evidence that Defendant Shearer participated in a conspiracy to violate her rights. In fact, she stated just the opposite in her deposition:

> Q: And at that time [through the interrogatories] I asked you please specify in detail all acts or omissions by Vanessa Shearer that you allege to be wrongful, tortious, or that otherwise caused harm to you. And what was your answer?
>
> A: She didn't cause any harm to me.
>
> Q: Did she cause harm to you?
>
> A: No, sir.
>
> Q: Okay. Are you aware of any conspiracy that she did?
>
> A: Not to me.

Kittles Dep. 185:14-24. In her response brief, Plaintiff appears to suggest that Shearer nevertheless may have participated in the conspiracy despite her complete lack of evidence of a conspiracy because "[r]arely do conspirators enlighten the victim of the conspiracy against the victim." Dkt. no. 43-1, p. 9. This may be true, but without evidence from which a jury could determine a conspiracy actually existed, such insinuations amount to speculation.

Plaintiff has failed to show that Defendant Shearer participated in any conspiracy with HCS or its agents to

AO 72A
(Rev. 8/82)

terminate Plaintiff. The only potential conspirators left, then, are HCS and its agents, who are private persons and entities and thus cannot conspire to violate the rights at issue here. The Court must grant Defendants' motion for summary judgment on Plaintiff's § 1985(3) claim.

## IV. Intentional Infliction of Emotional Distress

Plaintiff also alleges in Count V of her Complaint a claim of intentional infliction of emotional distress. In Georgia, to prevail on a claim of intentional infliction of emotional distress, a plaintiff must show that:

> (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. The defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law.

Steed v. Fed. Nat. Mort. Corp., 689 S.E.2d 843, 851-52 (Ga. Ct. App. 2009). The severity of the emotional distress is a key element, and the "law intervenes only where the distress inflicted is *so severe* that no reasonable man could be expected to endure it." Bridges v. Winn-Dixie Atlanta, Inc., 335 S.E.2d 445, 448 (Ga. Ct. App. 1985) (emphasis added).

Here, even if the Court assumes that Plaintiff can satisfy the first three elements of the *prima facie* test, she has failed

AO 72A
(Rev. 8/82)

to produce any evidence aside from vague, conclusory allegations that her emotional distress was so severe that a reasonable person could not endure it. When Defendants raised this argument in their Motion for Summary Judgment (Dkt. no. 31-1), Plaintiff's response included no citations to the record evidence, but merely stated that "Ms. Kittles' emotional distress left deep wounds." Dkt. no. 42-1, p. 11. In light of Plaintiff's failure to point to any evidence of the severity of her emotional distress, the Court will grant Defendants' motion for summary judgment on this issue as well. Cf. Quarles v. McDuffie County, 949 F. Supp. 846, 855-56 (S.D. Ga. 1996) (granting summary judgment on an intentional infliction of emotional distress claim where the plaintiff had "produced no evidence beyond her own assertions to support her claim that she [had] suffered *severe* emotional distress, as the law requires.").

## V.   Attorney's Fees

Because Plaintiff's other claims have failed, she cannot recover attorney's fees.

## CONCLUSION

Plaintiff failed to point to evidence in the record showing a genuine dispute of material fact as to any of her claims. Defendants' motions for summary judgment (Dkt. nos. 29, 31) must

AO 72A
(Rev. 8/82)

therefore be **GRANTED** in their entirety. The Clerk of Court is directed to enter the appropriate judgment.

SO ORDERED, this 18TH day of March, 2015.


LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)